OPINIONS
GARY P. SULLIVAN, Chief Justice.

BRIEF FACTUAL OVERVIEW AND PROCEDURAL HISTORY

PlaintiffiAppellant Carroll James DeCo-teau (hereinafter DeCoteau or Appellant) received via mail, a Memorandum in “boilerplate form”[1] from one of the Appel- *279 lees/Defendants, Gary . James Melbourne (hereinafter Defendants or Appellees), which referenced a violation of the Fort Peck Tribes’ abandoned motor vehicle statute, then found at IX CCOJ § 120[2]. The notice was sent to appellant via certified U.S. Mail bearing a postmark of May 3, 2000. The record is void of any contact between the parties following the receipt of the notice on May 6th. On May 11, 2000, appellant filed in Tribal Court for a temporary restraining order (TRO) against Defendants, arguing that the Defendants (the Fort Peck Tribes acting through its named agents) were attempting to deprive appellant of his property ... “by threats of unfounded criminal action and coercion, without due process of law”. Ref. Petition for Order to Restrain—May 11, 2000—court file.
On May 12, 2000, the Tribal Court issued a Temporary Order to Restrain the defendants “from interfering with the Plaintiff, at all times, pending the hearing of said Petition”, on May 19, 2000.
On May 19, 2000, defendants, through counsel, responded to the Plaintiffs petition with a Motion to Dismiss for lack of “personal and subject matter jurisdiction” based upon the doctrine of tribal sovereign immunity. A brief hearing was held in the Tribal Court on May 19, 2000, wherein the appellant requested time to respond to the defendants’ Motion to Dismiss. The Court granted appellant’s request, allowing hirii until June 12, 2000 to respond and continued the hearing until June 30, 2000. The record does not show the disposition of the TRO following the initial hearing on May 19th and it is assumed that the TRO was dissolved by operation of law unless it was renewed and/or stipulated. Title VIII CCOJ 2000 § 401(c).
Following the hearing on June 30, 2000, the Tribal Court issued its Order, elated September 5, 2000, dismissing the action for lack of subject matter and personal jurisdiction based on the sovereign immunity of the Defendants.
This petition for review followed. Briefs were filed and oral argument was held on March 30, 2001.

ISSUES PRESENTED

Appellant contends that the doctrine of sovereign immunity does not bar suit brought against the Fort Peck Tribes under the Indian Civil Rights Act (found at 25 USC § 1302) and that the Tribal Court erred when it dismissed his suit alleging violations of that act by the Tribes and its agents. Additionally, appellant further contends that the Tribal Court’s ruling was contrary to this Court’s case law, “whieh has consistently upheld that the individual rights of tribal members are protected under the Indian Civil Rights Act.”
On the other hand, appellees contend that the Fort Peck Tribes enjoy sovereign immunity as a result of both Federal common law and Tribal statutory law and that such immunity can only by waived by the Tribes “clearly and explicitly” in statutory or contractual terms. Appellees further contend that “Tribal common law precedent mandates that lower tribal courts recognize the sovereign immunity of the Tribal Government and its agents when such agents are acting within their authority.”
Given the respective positions of the parties, we believe this controversy pres *280 ents the following issues for this Court’s review:
1. Whether the Tribal Court has adjudicatory jurisdiction of a civil action brought against the Port Peck Tribes pursuant to the Indian Civil Rights Act (25 USC § 1302 )?
2. Whether the Tribal Court has adjudicatory jurisdiction of a civil action brought against elected Tribal Officials and Tribal employees pursuant to the Indian Civil Rights Act (25 USC § 1302)?

STANDARD OF REVIEW

We review jurisdictional orders of the Tribal Court de novo. Title II CCOJ 2000 § 202.

DISCUSSION

Each party argues that both federal common law and Tribal statutory and/or common law, supports their respective positions. Thus, we begin our analysis by examining the status of Indian tribes’ sovereign immunity under federal common law.
Tribal sovereign immunity in the federal courts. Both sides cite the landmark U.S. Supreme Court decision in Santa (tiara. Pueblo v. Martinez, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978), in support of their respective positions. On the one hand, appellant contends that as a result of Sarnia Clara Pueblo, “tribal courts are the sole protect(or) of civil rights (under ICRA as) against the actions of tribal governments.” On the other hand, appellees, urge that, "... in the leading ICRA case (citing Santa Clara Pueblo ), the U.S. Supreme Court refused to find a congressional waiver of tribal sovereign immunity in the passage of the ICRA.” We agree with both positions as noted below.
In Santa Clara Pueblo, a female tribal member and her daughter brought an action for declaratory and injunctive relief in Federal District Court against the Pueblo and its Governor, contending that enforcement of a tribal ordinance denying membership in the tribe to children of female members who married outside the tribe while extending membership to children of male members who married outside the tribe, constituted a denial of equal protection under ICRA (25 USC § 1302[8j). 436 U.S. at 51, 98 S.Ct. at 1673. The Santa Clara Pueblo Court held that civil action suits against Indian Tribes pursuant to ICRA are barred In federal court by the tribe’s sovereign immunity, stating:
“Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers.” (citations omitted) This aspect of tribal sovereignty, like all others, is subject to the superior and plenary control of Congress. But “without congressional authorization,” the “Indian Nations are exempt from suit. (citations omitted)”
“It is settled that a waiver of sovereign immunity ... ‘cannot be implied but must be unequivocally expressed.’ ” (citations omitted) Nothing on the face of Title I of the ICRA purports to subject tribes to the jurisdiction of the federal courts in civil actions for injunctive or declaratory relief.” 436 U.S. at 58-59; 98 S.Ct. at 1677 (Our emphasis)
From this holding, it is clear that appellees are correct in stating that the Santa Clara Pueblo Court refused to find a Congressional waiver of Indian Tribes’ traditional sovereign immunity in the enactment of ICRA and that civil suits brought pursuant to ICRA are barred in federal courts by the Tribes’ sovereign immunity.
*281 Nonetheless, the question oí whether the tribes’ agents, officials and employees enjoy the same immunity remains, as well as appellant’s issue regarding the assertion that Tribal Courts are the “sole protector” of civil rights under the ICRA. The Santa Clara Pueblo Court addressed both issues:
“Tribal forums are available to vindicate rights created by the ICRA, and § 1302 has the substantial and intended effect of changing the law which these forums are obliged to apply. [footnote ] Tribal courts have repeatedly been recognized as appropriate forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians.” (436 U.S. at 65, 98 S.Ct. at 1680-1681)
“By not exposing tribal officials to the full array of federal remedies available to redress actions of federal and state officials, Congress may also have considered that resolution of statutory issues under § 1302, and particularly those issues likely to arise in a civil context, will frequently depend on questions of tribal tradition and custom which tribal forums may be in a better position to evaluate than federal courts.” (436 U.S. at 71, 98 S.Ct at 1683)
From this part of the holding the Santa Clara Pueblo court sustains appellant’s contention that the Tribal Court is the “sole protector” of civil rights guaranteed in the ICRA by designating the Tribal Court as the appropriate forum for civil actions brought pursuant to ICRA. In doing so, the holding also appears to bar suits in federal courts against tribal officials and employees which are brought pursuant to ICRA.
Both appellant and appellees cite other federal eases and we acknowledge each one, as well as a host of others, that deal with ICRA. However, we need go no further than Santa Clara Pueblo to determine whether Indian Tribes and their elected officials, employees and agents, enjoy sovereign immunity from civil suits pursuant to ICRA. With the exception of hatean corpus, which is not in issue here, the answer with reference to federal courts is in the affirmative and as to Tribal Courts it is in the negative. In short, we believe that federal common law prohibits federal court jurisdiction for civil suits against Indian Tribes and their officials, employees and agents, while encouraging and designating the tribal courts as the most appropriate forum for lawsuits under ICRA.
We now turn our attention to Tribal Law.
Tribal sovereign immunitg in tribal courts[3] With respect to whether our Tribal Courts have adjudicatory jurisdiction over the Tribes, appellee cites Title II CCOJ 2000 § 110 as controlling. We agree. §110 states: “The Tribes shall be immune from suit. Nothing in the Code shall be construed as consent of the Tribes to be sued.” We find this provision to be straight forward and definite. The words are plain and the meaning is clear. As such, this provision needs no interpretation from this Court.
Nonetheless, appellant contends that this provision notwithstanding, the Tribes’ sovereign immunity “has never been purely sovereign” in that “(t)he U.S. Congress has a longstanding and legally recognized plenary power over (Indian) tribes.” Appellant goes on to state, “It can only be *282 assumed that tribal courts have a duty to enforce the ICRA regardless of any tribal objection, and without having to obtain tribal consent.” Appellant does not specifically cite authority lor this proposition; however, support could be inferred from Santa Clara Pueblo:
“Tribal forums are available to vindicate rights created by the ICRA, and § 1302 has the substantial and intended effect of changing the law which these forums are obliged to apply.” [4] (430 U.S. at 65, 98 S.Ct. at 1680) (Our emphasis)
It is axiomatic from a simple reading of ICRA that Tribal governments are obliged to apply each of its terms. By foreclosing the federal courts to hear these civil rights violations, it could be inferred that the Santa Clara Pueblo court is stating that Indian Tribes are obliged to apply ICRA in their own Tribal courts. If so, would such an obligation necessarily waive the sovereign immunity of the Tribes? There is little doubt that an argument can be made for that proposition. However, we find it unnecessary to travel that dubious path of “ifs and buts”. The relevant question is whether the Fort Peck Tribes has, as an Indian government, adequately complied with the provisions of the ICRA and whether the members of the Fort Peck Tribes, the Indians and non-Indian residents within the exterior boundaries of the Fort Peck Tribes, are protected from governmental violations of the provisions of ICRA. We answer that question in the affirmative.
Does the sovereign immunity of the Tribes extend to its officials, employees and agents? Although the Fort Peck Tribes declined to waive its sovereign immunity, it is quite clear that the Tribes provided a statutory scheme to protect the rights of its constituency and grant appropriate relief when those rights are violated. Title II CCOJ 2000 § 111 provides:
Sec. 111. Suits against Tribal officials.
The Court shall have jurisdiction over all suits in which Tribal officials or employees are defendants, except habeas corpus proceedings authorized by 25 U.S.C. 1303.
(a) Suits for money damages. No elected official or judge of the Tribes shall be subject to suit for any action taken in the course of his/her official duties, or in the reasonable belief that such action was within the scope of his/ her official duties.
(b) No employee of the Tribes shall be subject to suit for money damages for any action taken in the course of his/her official duties, or in the reasonable belief that such action was within the scope of his/her official duties, unless it is clearly established that such action was taken with malicious intent and in bad faith. The Court shall have jurisdiction over actions seeking declaratory and equitable relief against tribal employees, but the Court shall not grant any relief *283 against tribal employees except after-service of process has been made as prescribed in this Code and proof of service has been received by the Court.
Again, we find the words setting forth the general premise of this provision to be straight forward and definite. “The Court shall have jurisdiction over all suits in which Tribal officials or employees are defendants ...”[5] (Our emphasis ). These words are clear and plain, requiring no interpretation from this Court.
However, we are compelled to acknowledge that the sub-sections of § 111 are not quite as clear. When the language of a statute is unclear, it is the duty of this Court to interpret the meaning of the statute and eliminate such ambiguity, preserving at all times the policy and intent of the Fort Peck Tribal Council. Todd v. GMAC, FPCOA 215 (1995).
Sub paragraph (a) grants immunity to elected officials and judges regarding money damages if they were acting “in the course of his/her official duties, or in the reasonable belief that such action was within the scope of his/her official duties.”
Sub paragraph (b) grants the same immunity to tribal employees, however, while (b) uses identical language to (a), an additional phrase appears: “... unless it is clearly established that such action was taken with malicious intent and in bad faith.” Whether this additional phrase applies equally to (a) is not presently before us, thus we leave that question to another day.
Finally, the last sentence in (b) ■-grants the Tribal Court jurisdiction over actions seeking declaratory and equitable relief against tribal employees. At first glance, it appears that this grant of declaratory and equitable jurisdiction is simply misplaced and should have its own sub-section. However, the grant itself is expressly limited to “tribal employees” in that it does not mention “tribal officials” or “judges” as does (a).
Nonetheless, when § 111 is read altogether, we believe the grant of declaratory and equitable relief extends to “tribal officials” and “judges” as well as tribal employees. We find the words of the general premise of § 111 dispositive: “The Court shall ham jurisdiction over all suits in which Tribal officials or employees are defendants ...” (Our emphasis) This is an all inclusive grant in clear and definite terms, thus any exception to this grant must be equally clear and definite. Sub provisions (a) and (b) must be read in the context of “suits for money damages” and such suits are the only limitations cited. No other exceptions are mentioned or alluded to.
The last sentence in (b), which relates to declaratory and equitable relief, is totally superfluous to the basic content of § 111 for two reasons. First, its only purpose appears to insure proper notice to the tribal employee and filing of proof of that notice with the Tribal Court in accordance with the CCOJ, a task which must be completed in any case to comport with “due process” requirements. Further, if the last sentence of (b) purports to be a fresh grant of jurisdictional authority, as to tribal employees only, it would fail simply because it would be unnecessary in light of the pervasive grant authorized in the general premise. In other words, why would a sub-section need to authorize a -grant already given in the main?
*284 However, in determining that the language which specifically relates to declaratory and equitable jurisdiction in § 111 is unnecessary, the question arises as to whether the qualifying language that no tribal official or employee shall be, “subject to suit ... for any action taken in the course of his/her official duties, or in the reasonable belief that such action was within the scope of his/her official duties” applies equally to declaratory and equitable actions. For the answer to that question we need look no further than the ‘law of common sense.’ It should be obvious that our Tribal Council would not contemplate subjecting its officials and employees to a law suit which complains that the tribal official or employee was guilty of acting within the scope of his/her official duties or employment. If such a complaint did exist, it would necessarily go to the Tribes’ policies and therefore be directed at the Tribes and not the official or employee. Title II CCOJ 2000 § 113 is an example:
“Sec. 113. Review of administrative decisions.
(a) The Court shall have exclusive jurisdiction over all appeals from actions by agencies or offices of the Tribes, where such appeals are authorized by this Code.
(b) Notwithstanding Section 110 of this Title, the Tribes hereby waive their immunity from suit in Tribal Court for appeals under subsection (a). Relief against the Tribes shall be limited to that specified in the provisions of the Code authorizing the appeal. In no event shall the Tribes be liable for money damages, except that the Tribal Court may order refunds of taxes or fees erroneously collected where such relief is specifically authorized by the provision of the Code under which the appeal is taken.” (Our emphasis );
While jurisdiction under § 113 is limited to administrative decisions, it is illustrative of the point. Sub-section (a) does ■not authorize suit against tribal officials or tribal employees, but rather, grants the Tribal Court jurisdiction over the “agencies or offices of the Tribes”. It is reasonable to assume that this section contemplates that the tribal official or tribal employee acted entirely within the scope of his/her duties and that it is the policy and/or decision of the agency with which issue is taken[6].
It is our firm belief, and we so hold, that tribal officials and employees are subject to the adjudicatory jurisdiction of our Tribal Court in declaratory and equitable actions, as well as suits for money damages, in accordance with § 111. If this were not so, and if our Tribal Council had wanted its elected officials to share the same immunity as the Tribes in declaratory and equitable actions, it would have expressed such an exception in the statute. Not having done so, the definite language of the general premise of § HI clearly expresses the intent of the Fort Peck Tribal Council.
We note that in every action brought against a tribal official or employee, the threshold question is whether the tribal official or employee acted ‘beyond the scope of his/her duties’. In answering that important question, our Tribal court may choose to bifurcate the action or, alternatively, entertain a motion for dismissal, if early on in the trial it is found that the actions complained of were within the scope of the official’s or employee’s duty.
*285 While our holding today simply clarifies existing law, we are not unmindful that some may misread this opinion as a clarion call to have our Tribal Court scrutinize the daily operations and functions of the many fine governmental agencies serving the Fort Peck reservation. Such thinking would be no more than a mental flight into fantasy. We have absolutely no interest in presenting a gilded invitation to invade our Tribal Courts with frivolous complaints by those who appear to be perpetually dissatisfied with almost every thing any governmental agency undertakes.
On the other hand, our Tribal Council has in the past, and continues to be concerned that all of those who are subject to the laws and policies of the Fort Peek government have access to air legitimate grievances. We note that our Tribal Council has always maintained that it is best to go to the source of the problem and make every attempt to settle the issue directly. It is for that reason the Council maintains “open doors” to hear from its constituency. In other words, if one does not approve of what our Tribal Council is doing, the Council members want to be the first to know. It is in that spirit that we offer the following guidelines to our Tribal Court in reviewing future actions under § 111.
The first, if not most important requirement, is a declaration signed by the complainant under penalty of perjury and attached to the complaint, attesting to the material facts as to his/her attempts to rectify the situation with the subject Tribal Official/Employee and/or Tribal Agency. Failure of this requirement subjects the complaint to summary dismissal.
Secondly, the complaint must contain all of the following:
(a)Time, date, and place of act or conduct (if the actions complained of take the form of a letter or official proclamation, date on document and the extent of its distribution, if known)
(b) Name of Tribal Official/Employee and their position and department/agency with the Tribes at the time of their act or conduct.
(c) Citation of Tribal CCOJ 2000 provision, Court Rules, Tribal Ordinance, Regulation, Policy, Fed Code, Regulation, or Rules, claimed to have been violated. (Such perfunctory phrases as, “Violates my basic constitutional rights”; “Violates the rights given to me under ICRA”; or “They didn’t treat my friend this way when he had to deal with them so that means they denied me equal protection”; etc., standing alone, do not meet this requirement and should be summarily rejected.)
(d) Statement regarding claimant’s attempt to place the Tribal Qffieial/Em-ployee on Notice of alleged violation and the subsequent attempt(s) of, or offers by, claimant to comply, if claimant has been requested to do so.
In applying the above guidelines to the case herein, we have previously noted that the record is void of any contact between appellant and the appellees after appellant received the certified letter. (See Brief Factual Overview and Procedural History, supra) In the absence of a showing that appellant made good faith attempts to resolve the dispute with the appellees, the Tribal Court was correct in dismissing the action.
Accordingly, the dismissal as to the Fort Peck Tribes is affirmed under the doctrine of sovereign immunity and the dismissal as to the Fort Peck officials/employees is affirmed for failure to provide sufficient evidence that appellant attempted to resolve the dispute before filing his complaint.
IT IS NOW THEREFORE the order of this Court that the order of dismissal as to *286 the Fort Peck Tribes is affirmed and the matter is remanded with instructions to the Tribal Court to issue a new and different order of dismissal, consistent with this opinion, as to the Tribal officials and employees, said order to include the phrase “dinmitsued withont prejudice
CONCUR: GERARD M. SCHUSTER, Associate Justice.

. The Memorandum stated, in pertinent part:
“TO: All Abandoned/Junk Vehicle Owners
FROM: Gary James Melbourne, Tribal Health Officer
SUBJECT: Abandoned/Junk Motor Vehicles DATE: March 8, 2000
It shall be a violation of the Comprehensive Code of Justice for any vehicle to be abandoned or junked on Tribal trust land or in or any urban area (sic) within the Fort Peck Reservation, or on individual trust land within the Fort Peck Reservation.
You are hereby given ten (10) days from receipt of this order to repair and license the vehicle or to move it to an approved repair or storage facility. If the vehicle is not repaired and licensed or moved to an approved storage facility in the tune period specified, the Tribal Health Oíhcei or the Tribal Police Captain have the power to order the vehicle condemned and to dispose of the vehicle in an approved manner.
[[Image here]]
If you have any questions or comments, please contact me at 768 -5301 or 349 i, Extension 4307. cc:
Tribal Chairman
*279 Captain, Tribal Police
File”
(Note: The initials of Mr. Melbourne appear immediately following the “FROM" line.)

. Now Tille XVII CCOJ 2000 S 120.

. Appellant and appellees cite various decisions of this Court as sustaining their respective positions. However, we find the issue clearly resolved by tribal statutory law, therefore we find it unnecessary to examine the cited cases. We also note that this Court has not previously spoken regarding the precise issues involved in this case.

. The quoted portion of the text makes reference to "Footnote 20” which reads:
“FN20. Prior to passage of the ICRA, Congress made detailed inquiries into the extent to which tribal constitutions incorporated ‘Bill of Rights' guarantees, and the degree to which the tribal provisions differed from those found in the Constitution. See, e.g,, 1961 Hearings 121, 166, 359; Hearings before the Subcommittee on Constitutional Rights of the Senate Committee
on die Judiciary pursuant to S.Res.58, 88th Cong., 1st Sess., 823 (1963). Both Senator Ervin, the ICRA’s chief sponsor, and President Johnson, in urging passage of the Act, explained the need for Title I on the ground that few tribal constitutions included provisions of the Bill of Rights. See House Hearings 131 (remarks of Sen. Ervin); 114 Cong.Rec. 5520 (1968) (message from the President).”

. This provision provides for an exception of habeas corpus relief under 25 USC 1303 which is not in issue here.

. If a tribal official or employee were to act “beyond the scope of his/her duties’’ in this Administrative context, § 111, not § 113, would authorize the action.